UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 1393, | ) ) ) |
| *Petitioner*, | ) ) |
| vs. | ) )   1:20-cv-1689-JMS-TAB ) |
| CARROLL WHITE RURAL ELECTRIC MEMBERSHIP CORPORATION, | ) ) ) |
| *Respondent*. | ) |

## ORDER

Petitioner International Brotherhood of Electrical Workers, Local 1393 ("the Union") files this petition pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, and the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, to compel Respondent Carroll White Rural Electric Membership Corporation ("the Company") to arbitrate a dispute concerning whether the Company violated the terms of a collective bargaining agreement by requiring a former employee to pay back money that the Company loaned him to cover the cost of training. The petition is now ripe for the Court's review.

## I.
### LEGAL STANDARD

Under § 4 of the FAA, "a party 'aggrieved' by the failure of another party 'to arbitrate under a written agreement for arbitration' may petition a federal court 'for an order directing that such arbitration proceed in the manner provided for in such agreement.'" *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (quoting 9 U.S.C. § 4). To compel arbitration, the party filing the petition must show: (1) an agreement to arbitrate; (2) a dispute within the scope of the

arbitration agreement; and (3) a refusal by the opposing party to proceed to arbitration. *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 466 F.3d 577, 580 (7th Cir. 2006) (citations omitted).

"[A] grievance arbitration provision in a collective [bargaining] agreement [can] be enforced by reason of [§] 301(a) of the [LMRA]."[1] *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 577 (1960) (citing *Textile Workers v. Lincoln Mills*, 353 U.S. 448 (1957)). Federal courts have developed a specific body of law for determining the arbitrability of labor disputes that is distinct from, though similar in many material respects to, the general law governing the arbitrability of commercial disputes under the FAA. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 n.6 (2010) ("We, like the Court of Appeals, discuss precedents applying the FAA because they employ the same rules of arbitrability that govern labor cases."); *Part-Time Faculty Ass'n at Columbia Coll. Chicago v. Columbia Coll. Chicago*, 892 F.3d 860, 864 n.6 (7th Cir. 2018) ("[A]s a technical matter, '[i]n seeking to confirm an arbitration award created by virtue of a collective bargaining agreement, recourse is to the LMRA, not the FAA[,]'" however, "arbitration under the LMRA and the FAA are generally subject to the same governing principles." (citations omitted) (second alteration in original)); *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 359 (7th Cir. 1997) ("The big thing that section 301 did (besides creating federal jurisdiction over suits to enforce collective bargaining agreements), so far as labor arbitration is concerned, was to ordain the creation of a body of federal common law to govern disputes arising out of such arbitration.").

---

[1] Section 301(a) of the LMRA, codified at 29 U.S.C. § 185(a), states: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

The foundation of the law of arbitrability of labor disputes was laid by the Supreme Court in a collection of cases known as the *Steelworkers* Trilogy: *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); and *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960). *See Granite Rock*, 561 U.S. at 299 n.6; *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) ("The principles necessary to decide this case are not new. They were set out by this Court over 25 years ago in a series of cases known as the *Steelworkers* Trilogy . . . .").

From the *Steelworkers* Trilogy, the Supreme Court has distilled four important rules that will guide this Court's analysis. *See AT & T Techs.*, 475 U.S. at 648-50. First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* at 648 (quoting *Warrior & Gulf*, 363 U.S. at 582). "The second rule, which follows inexorably from the first, is that the question of arbitrability—whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Techs.*, 475 U.S. at 649 (citations omitted). The third rule is that, in determining whether to submit a particular grievance to arbitration, a court should not rule on the potential merits of the underlying claims, even if those claims "appear[] to the court to be frivolous." *Id.* at 649-50. Finally, the fourth rule is that "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the

asserted dispute.  Doubts should be resolved in favor of coverage.'" *Id.* at 650 (quoting *Warrior & Gulf,* 363 U.S., at 582-583) (alteration in original).

## II.
### BACKGROUND[2]

The Company is a not-for-profit electric cooperative that delivers electricity to its consumers/members in several Indiana counties.  [Filing No. 14-1 at 2.]  The Company is headquartered in Monticello, Indiana and has an additional operational office in Delphi, Indiana. [Filing No. 14-1 at 2.]

On March 30, 2018, the Company hired Andrew Corsaletti to work as a groundman out of the Monticello office.  [Filing No. 1-1 at 2; Filing No. 14-1 at 4.]  In or around September 2018, Mr. Corsaletti was promoted to the position of apprentice lineman and, as a condition of his promotion, he and the Company executed a Training Cost Loan and Wage Assignment Agreement ("Loan Agreement").  [Filing No. 14-1 at 4.]  Pursuant to the Loan Agreement, the Company gave Mr. Corsaletti an interest-free loan to cover the cost of additional training and agreed that it would forgive the loan, prorated monthly, if he continued to work for the Company for four years.  [Filing No. 14-1 at 85.]  The Loan Agreement stated that if Mr. Corsaletti's employment ended for any reason other than death, disability, or reduction in force before the loan amount was reduced to zero, Mr. Corsaletti would be required to pay back the remaining balance, due on or before his last day worked.  [Filing No. 14-1 at 85.]  During the time when Mr. Corsaletti was hired, promoted, and required to sign the Loan Agreement, employees at the Monticello office, including Mr. Corsaletti, were not represented by the Union.  [Filing No. 1-1 at 2; Filing No. 14-1 at 3-4.]

---

[2] The facts are largely undisputed, save for some disagreements regarding details that the Court deems not material to the issue of whether arbitration is required.

Mr. Corsaletti was voluntarily transferred to the Company's Delphi office in the fall of 2019.[3] [Filing No. 1-1 at 2; Filing No. 14-1 at 5.] Upon his transfer, Mr. Corsaletti became part of the bargaining unit represented by the Union and became subject to the Collective Bargaining Agreement ("CBA") between the Company and the Union, effective October 1, 2018 to August 30, 2021. [Filing No. 1-1 at 2; Filing No. 14-1 at 5.]

The CBA contains several provisions that are relevant to this case. The first is Article I (the "Recognition Provision"), which states that "[t]he Company agrees to continue to recognize the Union as the collective bargaining agent for the collective bargaining unit . . . in matters pertaining to wages, hours and other terms and conditions of employment." [Filing No. 1-2 at 5.] The second is Article IV, Section 1 (the "Responsibility Provision"), which states that "[t]he Company and the Union agree to meet and deal with each other through their duly accredited officers, representatives and committees on all matters covered by the terms of this Agreement." [Filing No. 1-2 at 6.]

The CBA also provides for arbitrations of grievances (the "Grievance Provision"), stating: "Any difference arising between an employee or group of employees, the Union and the Company as to the interpretation or application of this Agreement, any of its terms or conditions, shall constitute a grievance hereunder which shall be dealt with" pursuant to a specified grievance process that culminates in arbitration. [Filing No. 1-2 at 7.] The CBA also states, in relevant part, that "[t]he arbitrator shall have no authority or jurisdiction to render a decision

---

[3]The parties' submissions differ as to the exact date that Mr. Corsaletti was transferred. [*Compare* Filing No. 1-1 at 2 (stating that the transfer occurred on August 26, 2019) *with* Filing No. 14-1 at 5 (stating that Mr. Corsaletti started working at the Delphi office on August 1, 2019, although he was not formally transferred there until October 1, 2019).] This is just one example of the many occasions on which the specific dates offered by the parties for certain events differ. The Court need not determine which specific dates are correct, though, as the discrepancy is not material. The parties do not dispute the general timeline of events.

which adds to, subtracts from, or modifies this Agreement, and the arbitrator's decision shall be confined to the meaning of the contract provision which gave rise to or relates to the dispute." [Filing No. 1-2 at 8.]

In addition, in Article XX (the "Apprentice Training Provision"), the CBA states that "[a]ll new Apprentice Lineman will be required to execute the Training Costs Loan and Wage Assignment Agreement." [Filing No. 1-2 at 29.] Pursuant to such Training Costs Loan and Wage Assignment agreement, the Company will give an interest-free loan to the apprentice lineman to cover the costs of training, and the loan will be forgiven over four years, prorated monthly, upon the employee's continued employment with the Company. [Filing No. 1-2 at 29.] The CBA provides that the loan would also be forgiven if employment terminates due to death, disability, or reduction in workforce, but if the employee terminates employment "for any other reason before the loan is reduced to zero, the employee will owe the Company the outstanding balance on the loan." [Filing No. 1-2 at 29.]

In March 2020, Mr. Corsaletti gave notice of his resignation, effective April 10, 2020. [Filing No. 1-1 at 2; Filing No. 14-1 at 97.] On March 31, 2020, the Company sent Mr. Corsaletti a letter informing him that he owed the Company $18,290.44 pursuant to the Loan Agreement. [Filing No. 14-1 at 97.] After a payment was deducted from Mr. Corsaletti's final paycheck, the outstanding balance that the Company sought to collect was $17,730.57. [Filing No. 14-1 at 6.]

The Union believed that the Company's attempt to enforce the Loan Agreement violated the terms of the CBA, so the Union filed a written grievance pursuant to the CBA's Grievance Provision. [Filing No. 1-1 at 2-3; Filing No. 14-1 at 6.] During a grievance meeting, the Union asserted that the Loan Agreement was no longer enforceable. [Filing No. 14-1 at 6.] When the

parties were unable to resolve the grievance, the Union demanded arbitration, and the Company refused.  [Filing No. 1-1 at 3.]  The Union then filed its Petition to Compel Arbitration, [Filing No. 1], which is now ripe for the Court's decision.

### III.
### DISCUSSION

**A.  Merits of the Petition to Compel Arbitration**

*1.  Overview of the Parties' Arguments*

The Union asserts that the Company's attempted enforcement of the Loan Agreement violates the Recognition Provision, the Responsibility Provision, and the Apprentice Training Provision of the CBA.  [Filing No. 6 at 11.]  Specifically, the Company contends that the CBA states that only "new Apprentice Linemen will be required to execute" training loan repayment agreements, and, because Mr. Corsaletti was not a "new Apprentice Lineman" when he transferred to the Delphi office and became subject to the CBA, he cannot be bound by the Loan Agreement.  [Filing No. 6 at 12-13.]  The Union also asserts that the Company's attempted enforcement of the Loan Agreement against Mr. Corsaletti violates the Recognition Provision— which requires the Company to recognize the Union as Mr. Corsaletti's sole bargaining agent— and the Responsibility Provision—which requires the Company to deal solely with the Union, and not with individual employees, concerning the terms and conditions of employment.  [Filing No. 6 at 13-14.]

The Union argues that the question of whether the Company violated the CBA is arbitrable under the *Steelworkers* Trilogy framework because: (1) the CBA's arbitration clause is broad and triggers a presumption of arbitrability; (2) there is no language in the CBA expressly excluding this dispute or any of the relevant provisions of the CBA from arbitration; and (3) resolution of the dispute will require the adjudicator to interpret or apply the Recognition

Provision, the Responsibility Provision, and the Apprentice Training Provision. [Filing No. 6 at 10-15.] The Union also argues that the fact that Mr. Corsaletti signed the Loan Agreement before he joined the Union's bargaining unit and became subject to the CBA "is irrelevant to whether the parties' dispute over [the Loan Agreement] presents an arbitrable dispute under the terms of the CBA," as the Company cannot use an individual agreement to modify the terms established by the CBA. [Filing No. 6 at 15-16.]

In response, the Company argues that this dispute does not concern a provision of the CBA, but rather involves the enforceability of the Loan Agreement, which is "wholly separate." [Filing No. 15 at 1.] The Company asserts that much of the caselaw cited by the Union is "inapposite" and the presumption in favor of arbitrability does not apply because the Company is not challenging the Union's interpretation of any provision of the CBA, but instead is challenging whether the CBA applies to this dispute at all. [Filing No. 15 at 7-8.] The Company contends that the Court can decide the merits of the dispute if doing so is necessary to decide the question of arbitrability, which is the case here. [Filing No. 15 at 9.] Specifically, the Company argues that the Loan Agreement was not automatically voided by Mr. Corsaletti's subsequent inclusion in the CBA because the Loan Agreement and the CBA are "entirely consistent." [Filing No. 15 at 9-10.] The Company maintains that determining that the Loan Agreement was not voided by the CBA does not require substantive interpretation of the CBA itself, and therefore does not require arbitration. [Filing No. 15 at 12-15.] In addition, the Company argues that: (1) the CBA prevents the arbitrator from interpreting the Loan Agreement, and therefore arbitration of a dispute concerning that agreement cannot be compelled, [Filing No. 15 at 14-15]; (2) the CBA does not apply retroactively, and therefore the arbitration procedures in the CBA do not apply to a dispute concerning the Loan Agreement, [Filing No. 15 at 16-18]; (3) any dispute regarding the

enforceability of Mr. Corsaletti's Loan Agreement is governed not by the CBA but by the collective bargaining agreement between the Company and its Monticello employees that was in effect at the time when the Loan Agreement was executed (the "Working Agreement"), for which the Union was not Mr. Corsaletti's designated collective bargaining representative, [Filing No. 15 at 18-23]; and (4) because the Loan Agreement does not contain an arbitration provision, compelling arbitration would be contrary to the Loan Agreement and would violate Mr. Corsaletti's contractual rights with respect to that agreement, [Filing No. 15 at 23-24].

In reply, the Union argues that the Company is attempting to apply incorrect law and that the *Steelworkers* Trilogy and its progeny control because there is no real dispute that the CBA contains an arbitration provision and the issue is whether the grievance presents a controversy that is within the scope of that provision. [Filing No. 18 at 6-7.] The Union maintains that there is no evidence showing that the parties mutually intended to exclude from arbitration disputes concerning the Recognition Provision, the Responsibility Provision, the Apprentice Training Provision, or loan payback agreements generally. [Filing No. 18 at 7-8.] The Union further argues that the Court should not address the merits of its claims that the Company violated the CBA and instead should consider only whether the claim is arbitrable. [Filing No. 18 at 8-12.] Because there are plausible interpretations of the relevant clauses of the CBA that would establish violations by the Company, the Union asserts, the question of whether the Company violated the CBA must be presented to the arbitrator, and the Company's argument that the Loan Agreement is still valid because it is consistent with the CBA "puts the cart before the horse" in the sense that in order to determine whether the agreements are consistent, the adjudicator must interpret the CBA. [Filing No. 18 at 12-15.] Whether the CBA is retroactive is irrelevant, the Union argues, because the conduct that it asserts violated the CBA—specifically, the Company's

maintenance and attempted enforcement of the Loan Agreement—occurred after Mr. Corsaletti became subject to the CBA. [Filing No. 18 at 15-16.] Finally, the Union argues that the Company's arguments concerning the Working Agreement are without merit, because the Working Agreement has nothing to do with Mr. Corsaletti's rights under the CBA. [Filing No. 18 at 16-17.]

### 2. *Applicable Law – Whether the* Steelworkers *Trilogy Applies*

As noted above, the *Steelworkers* Trilogy established the general framework for determining the arbitrability of labor disputes. The Company argues that these principles are "inapposite" because the parties do not have an agreement to arbitrate this dispute in the first instance. [Filing No. 15 at 7-8.] But the Company agrees that the CBA exists and that it contains a provision requiring that certain disputes between the Company and the Union be arbitrated. [*See generally* Filing No. 15.] The question, then, is whether the dispute in this case falls within the scope of the CBA's arbitration clause. To answer that question, the Court must apply the *Steelworkers* Trilogy principles. Thus, with these principles in mind, the Court will consider the question of arbitrability. Specifically, the Court will consider whether, through the CBA and in light of the presumption favoring arbitration in cases like these, the Union and the Company have agreed to arbitrate the particular dispute at issue here.

### 3. *Scope of the CBA's Arbitration Provision*

"In resolving an arbitrability issue the first step in determining coverage under the arbitration clause is to ascertain whether the present dispute falls within the scope of the arbitration clause." *Int'l Ass'n of Machinists & Aerospace Workers, Lodge No. 1777 v. Fansteel, Inc.*, 900 F.2d 1005, 1010 (7th Cir. 1990). To do this, courts look to the plain meaning of the arbitration provision, striving to avoid absurd results. *Int'l Bhd. of Elec. Workers, Local 21 v.*

*Illinois Bell Tel. Co.*, 491 F.3d 685, 688 (7th Cir. 2007) (citation omitted); *see also Karl Schmidt Unisia, Inc. v. Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am., UAW Local 2357*, 628 F.3d 909, 913 (7th Cir. 2010) ("The language of the CBA's arbitration clause forms the basis of our analysis.").

Even when the arbitration clause facially applies to a dispute, if the Court "can say with positive assurance that the parties intended to exclude the involved dispute from arbitration, then no obligation to arbitrate will exist." *Fansteel*, 900 F.2d at 1010-11. "To overcome the presumption of arbitrability, a party must show either an 'express provision excluding [the] grievance from arbitration' or 'the most forceful evidence of a purpose to exclude the claim from arbitration.'" *Karl Schmidt Unisia*, 628 F.3d at 913 (quoting *Warrior & Gulf*, 363 U.S. at 584-85) (alteration in original); *see also Granite Rock*, 561 U.S. at 297 ("Under that framework, a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." (emphasis in original)).

Here, the CBA defines grievances subject to arbitration to include "[a]ny difference arising between an employee or group of employees, the Union and the Company as to the interpretation or application of [the CBA], [or] any of its terms or conditions." [Filing No. 1-2 at 7.] That definition is broad.  Specifically, it is broad enough to encompass the Union's claims that the Company's maintenance and attempted enforcement of the Loan Agreement with Mr. Corsaletti violate the Recognition Provision, the Responsibility Provision, and the Apprentice Training Provision, because those claims and the Company's opposition to those claims constitute a "difference" arising between the Union and the Company "as to the interpretation or application" of those particular provisions of the CBA.  Put simply, the Union reads the CBA in such a way that it believes the Company's conduct violated several provisions, and the Company

11

reads the CBA in such a way that its actions were permissible.  In order to determine which party's interpretation is correct, the adjudicator will need to interpret and apply each of those provisions to the circumstances of this case.  Accordingly, based on the plain language of the CBA's arbitration clause, this dispute should be submitted to arbitration.  *See Am. Mfg. Co.*, 363 U.S. 564 ("The union claimed in this case that the company had violated a specific provision of the contract. The company took the position that it had not violated that clause. There was, therefore, a dispute between the parties as to 'the meaning, interpretation and application' of the collective bargaining agreement. Arbitration should have been ordered.").

The Company has not overcome the presumption of arbitrability in this case.  There is nothing within the CBA's Grievance Provision—or anywhere else in the CBA—that expressly exempts from arbitration claims relating to loan payback agreements or any other sort of claim implicating the Recognition Provision, the Responsibility Provision, or the Apprentice Training Provision.  *See Int'l Bhd. of Elec. Workers Local 2150 v. NextEra Energy Point Beach*, LLC, 762 F.3d 592, 596 (7th Cir. 2014) ("[A]ny exclusion of particular parties or issues from coverage by an agreement's arbitration provisions should not be inferred from the language of the agreement, but *must be stated explicitly in the agreement.*" (emphasis in original) (quoting *Ceres Marine Terminals, Inc. v. Int'l Longshoremen's Ass'n, Local 1969, AFL-CIO*, 683 F.2d 242, 247 (7th Cir. 1982)).  However, the Company makes several additional arguments, presumably in an attempt to demonstrate "the most forceful evidence of a purpose to exclude the claim from arbitration." *See Karl Schmidt Unisia*, 628 F.3d at 913.  The Court finds that these arguments do not successfully overcome the presumption in favor of arbitration, but their rejection warrants further comment.  Accordingly, each will be addressed in turn below.

### 4.   *The Company's Other Arguments*

    a.   Whether the CBA Voided the Loan Agreement

The Company asserts that "[t]he Union's arbitration demand is entirely premised on its argument that the Loan Agreement was voided upon [Mr.] Corsaletti's subsequent inclusion in the collective bargaining unit," but "all applicable judicial authority is to the contrary, and supports that the Loan Agreement remains in full force and effect." [Filing No. 15 at 9.] The Company argues that the CBA does not explicitly address the treatment of individual employment agreements that predate the CBA, and such silence "strongly implies that the Loan Agreement is therefore not subject to the CBA, and thus any dispute regarding it is not subject to the CBA grievance procedure." [Filing No. 15 at 10-11.] The Company also argues that the Loan Agreement survived Mr. Corsaletti's inclusion in the CBA because the agreements are consistent with each other. [Filing No. 15 at 11.] Specifically, the Company argues that the Apprentice Training Provision does not conflict with the Loan Agreement because: (1) Mr. Corsaletti was a "new" apprentice lineman when he executed the Loan Agreement; (2) the Apprentice Training Provision does not apply to Mr. Corsaletti at all, because he was not "new" when he became subject to the CBA; or (3) even if he was "new" by virtue of being new to the collective bargaining unit, the Loan Agreement's terms were the same as the terms outlined in the CBA. [Filing No. 15 at 11-12.] Finally, the Company asserts that comparing the terms of the CBA to the terms of the Loan Agreement to determine whether they are consistent is not the same as "interpreting" the terms of the CBA, and the Court need not positively determine that the Loan Agreement is enforceable in order to determine that arbitration of this dispute pursuant to the CBA is improper. [Filing No. 15 at 13-14 (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386,

397, 399 n.15 (1987); *Loewen Grp. Int'l, Inc. v. Haberichter*, 65 F.3d 1417, 1421-23 (7th Cir. 1995)).]

The Union asserts that "[t]he Company's argument on this point puts the cart before the horse" by assuming that the Loan Agreement is consistent with the CBA "when, in fact, that is disputed by the Grievance." [Filing No. 18 at 13.] The Union argues that whether the CBA voided the Loan Agreement is a matter for the arbitrator to decide, and "[t]he Company does not get to unilaterally declare the Agreement consistent with the CBA to avoid arbitration." [Filing No. 18 at 12-13.]

The Company primarily relies upon two cases in support of its argument: *Caterpillar* and *Loewen*. In *Caterpillar*, the Supreme Court addressed whether § 301 of the LMRA preempted employees' claims based on individual contracts between the employees and the employer—which were separate from the relevant collective bargaining agreement—such that the claims were removable to federal court. *See* 482 U.S. at 394-95. In concluding that the employees' state law claims based on the individual contracts were not totally preempted, the Supreme Court noted that "individual employment contracts are not inevitably superseded by any subsequent collective agreement covering an individual employee, and claims based upon [the individual contracts] may arise under state law." *Id.* at 396.

Later, in *Loewen*, the Seventh Circuit, also considering whether § 301 preempted the plaintiff's state law claims, reviewed the relevant caselaw and explained that "when the collective bargaining agreement is merely a tangential consideration in the resolution of an otherwise independent state law action or where resort to its provisions is merely pro forma, we can say with confidence that such consultation does not trigger § 301 preemption." 65 F.3d at 1422. The

Court also reiterated that "[a] collective bargaining agreement . . . supersedes an individual employment contract to the extent that they are inconsistent." *Id.* at 1423.

In so concluding, the *Loewen* Court observed that "merely examining the collective bargaining agreement to determine whether a conflict actually exists is not 'interpreting' the collective bargaining agreement for § 301 preemption purposes," because if that were the case, "the section 301 pre-emption doctrine would swallow the rule that employees covered by collective bargaining agreements are entitled to assert legal rights independent of that agreement, including state-law contract rights, so long as the contract relied upon is not a collective-bargaining agreement." *Id.* (internal quotations, citations, and emphasis omitted). "It is rather the substantive examination for the purposes of actually deciding the outcome of the action that has the potential to invade the primacy of the arbitrator. A quick look in order to determine that no such substantive evaluation is necessary—that is, to see if the allegations of conflict are well founded or have a reasonable chance of success—does not actually decide anything and therefore poses no danger of inconsistency in interpretation." *Id.* at 1423-24.

The Court agrees with the Union's position that whether the Loan Agreement was superseded or voided by the CBA is a matter for the arbitrator to decide. The Company's reliance on *Caterpillar* and *Loewen* is misplaced for two reasons. First, the issue in this case is not whether a state law claim is preempted by § 301 of the LMRA, and neither *Caterpillar* nor *Loewen* directly addressed the issue of arbitrability. Second, and more importantly, a "quick look" at both the CBA and the Loan Agreement reveal that substantive interpretation of the CBA will be necessary to determine whether the two agreements are indeed consistent with each other and, by extension, whether they can coexist.

For example, one of the Union's arguments is that the CBA mandates that only "new Apprentice Linemen" can be bound by loan payback agreements and the Company's attempt to enforce a payback agreement against Mr. Corsaletti, who is not a "new Apprentice Lineman," therefore violates the Apprentice Training Provision. The Company, on the other hand, provides several alternative interpretations of what it means to be "new" in an attempt to demonstrate that the provision does not apply to Mr. Corsaletti: "new" meaning just having been hired to work as an apprentice lineman, versus "new" by virtue of just having become subject to the CBA. [*See* Filing No. 15 at 11-12.] Ironically, rather than lending support to the proposition that the agreements are consistent, this argument only highlights that there is more than one plausible interpretation of "new" as used in the Apprentice Training Provision, and the arbitrator will need to determine which is correct in order to determine whether and how the Apprentice Training Provision applies to Mr. Corsaletti. The same is true regarding the Recognition Provision and the Responsibility Provision—the arbitrator will need to determine whether, as the Union asserts, these provisions prevent the Company from maintaining or enforcing individual employment agreements or whether, as the Company asserts, they do not. The Court expresses no opinion as to the merits of these arguments at this juncture, but merely observes that both parties' asserted interpretations of the CBA are plausible and could potentially create a conflict between the Loan Agreement and the CBA.

In sum, the question of whether the CBA voided the Loan Agreement and the question of whether the Company violated the CBA by maintaining and attempting to enforce the Loan Agreement are merely two sides of the same coin. And, for the reasons discussed above, the arbitrator must decide both of those questions.

       b.  Retroactivity of the CBA

The Company asserts that the arbitration provisions in the CBA do not apply retroactively and therefore cannot be the basis of compelling arbitration relating to conduct that predated the CBA.  [Filing No. 15 at 16-18.]  However, this argument misapprehends the Union's grievance.  The Union is not challenging the initial execution of the Loan Agreement, which the parties do not dispute occurred before Mr. Corsaletti was part of the collective bargaining unit and subject to the CBA.  Instead, the Union is challenging the Company's actions in maintaining and attempting to enforce the Loan Agreement *after* Mr. Corsaletti became subject to the CBA.  Put simply, the Union is not asserting that the CBA is retroactive, and retroactivity has no bearing on whether the underlying dispute is arbitrable.

       c.  The Working Agreement

In a similar vein as its retroactivity argument, the Company asserts that the validity of the Loan Agreement should be determined in accordance with the Working Agreement, the collective bargaining agreement to which Mr. Corsaletti was subject when he signed the Loan Agreement.  [Filing No. 15 at 18-23.]  But again, this argument misses the point.  The Union's claims are based on actions that the Company took after the CBA applied to Mr. Corsaletti, and resolution of those claims is dependent upon interpretation of the CBA, not the Working Agreement.

**B.  Attorneys' Fees**

The Union argues that it is entitled to reimbursement for attorneys' fees, costs, and litigation expenses because "there is no reasonable basis in law or fact for the Company to refuse to arbitrate the Grievance and force the Union to pursue this litigation."  [Filing No. 6 at 16-17.]  The Union asserts that the underlying dispute is "plainly arbitrable under controlling and easily

understood precedent" and, in refusing to submit to arbitration, the Company has wasted the Union's and the Court's time and resources.  [Filing No. 6 at 17.]

In response, the Company argues that attorneys' fees are inappropriate because "the basis of the Union's claim is founded in the Loan Agreement, and thus [the Company] very reasonably opposed the Union's arbitration demand founded on its rights under the subsequently-enacted CBA." [Filing No. 15 at 26.]  The Company asserts that there is no evidence that it is acting in bad faith.  [Filing No. 15 at 26.]

In reply, the Union contends that the Company's response to the petition to compel arbitration "fails to address the substantive arbitrability issue head on and asserts several irrelevant and misleading arguments which are clearly a distraction from that issue," which only reinforces the Union's claim that it is entitled to attorneys' fees and costs.  [Filing No. 18 at 18.] The Union also reiterates its previous argument that the Company had no basis for refusing arbitration and therefore should be required to pay fees and costs.  [Filing No. 18 at 18-20.]

Courts can "require[] the losing party in labor arbitration cases to pay reasonable attorneys' fees and costs incurred by its opponent(s) when the arguments it has advanced are frivolous and/or vexatious." *Alberici-Eby v. Local 520, Int'l Union of Operating Engineers*, 992 F.2d 727, 734 (7th Cir. 1993). *See also Johnson Controls, Inc. Sys. & Servs. Div. v. United Ass'n of Journeymen & Apprentices of Plumbing & Pipe Fitting Indus. of U.S. & Canada, AFL-CIO*, 39 F.3d 821, 826 (7th Cir. 1994) (refusing to award attorney's fees where the "case present[ed] at least a colorable question of law"); *Chrysler Motors Corp. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO*, 959 F.2d 685, 689 (7th Cir. 1992) ("Although § 301 does not expressly authorize the award of attorney's fees, a prevailing party is entitled to such fees if the opponent's suit has no merit or is 'frivolous,' that is, brought in bad faith to harass rather than to win.");

18

*Dreis & Krump Mfg. Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 8*, 802 F.2d 247, 255 (7th Cir. 1986) (noting that it is "imperative that the federal courts impose sanctions on persons and firms that abuse their right of access to these courts").

The Court finds that the Company's opposition to arbitration, while ultimately unsuccessful, is not frivolous, harassing, or undertaken in bad faith. As discussed above, the Union is correct that existing federal law requires that this dispute be submitted to arbitration. But the Company's position is not unreasonable. In support of this conclusion, the Court makes two observations. First, although the *Steelworkers* Trilogy principles are relatively straightforward, their application in this case was complicated by the existence of a separate Loan Agreement, out of which this dispute could fairly be characterized as arising. Furthermore, the Company's characterization of this dispute as one arising out of the Loan Agreement, although not ultimately convincing to the Court, was at least arguably based on a non-frivolous interpretation of existing law concerning LMRA preemption. Second, and relatedly, resolving the question of whether the Company's conduct violated the CBA may only get the parties so far in resolving the question of whether Mr. Corsaletti must pay back the costs of his training. If, for example, it is determined that the Company did not violate the CBA, the arbitrator may not be empowered to consider other issues that are potentially relevant to the Company's ability to recover payment under the Loan Agreement. Given this context, the Court concludes that an award of attorneys' fees and costs is not appropriate.

### C.  Whether the Case Should be Stayed or Dismissed

Under the FAA, the general rule is that, after determining that a matter should be referred to arbitration, the Court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the

applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. However, many courts have recognized that a district court, in its discretion, may dismiss an action where it is clear that, after arbitration has concluded, no claims will remain for the court to resolve. *See Hauptman v. Midland Credit Mgmt., Inc.*, 2019 WL 8436961, at *2 (N.D. Ill. Jan. 31, 2019) (noting that "the Seventh Circuit has repeatedly affirmed district courts' decisions to dismiss suits where all claims are arbitrable" and "[s]everal circuits have found [a] 'judicially-created exception to the general rule which indicates district courts may, in their discretion, dismiss an action rather than stay it where it is clear the entire controversy between the parties will be resolved by arbitration'" (citations omitted); *Johnson v. Orkin*, LLC, 928 F. Supp. 2d 989, 1010 (N.D. Ill. 2013) ("Because all of the claims in this suit are subject to arbitration, leaving the Court with nothing left to do, the suit is dismissed.") *aff'd*, 556 F. App'x 543 (7th Cir. 2014); *see also Nevill v. Johnson Controls Int'l PLC*, 364 F. Supp. 3d 932, 953 (E.D. Wis. 2019) (dismissing the case under Fed. R. Civ. P. 12(b)(3) for improper venue where "the issue referable to arbitration is the issue at the heart of the federal lawsuit," noting that "[i]f the court were to 'stay' these federal court proceedings, it is not clear what would be left for the court to do once the arbitration has concluded").

In their briefing, neither party addresses whether, upon granting the Union's request to compel arbitration, the Court should dismiss this action or stay it pending the outcome of the arbitration process. The Court concludes that dismissal is the proper course of action. Once the issue of whether the Company's conduct violated the CBA has been arbitrated, there will be nothing left for this Court to consider. Although, as noted above, a dispute may remain between Mr. Corsaletti and the Company concerning their respective rights and obligations under the Loan Agreement, the Company acknowledges that such dispute is a matter of state law to be

20

resolved by a state court.  [*See* Filing No. 15 at 13 (stating that "an enforceability determination [regarding the Loan Agreement] can and should be left to Indiana state courts").]  The dispute between the Union and the Company regarding the CBA, however, will be fully resolved through arbitration, leaving nothing left for the Court to do.

## IV.
### CONCLUSION

Based on the foregoing, the Union's Petition to Compel Arbitration, [1], is **GRANTED** to the extent that the parties are **ORDERED** to submit their grievance to arbitration as outlined in the CBA.  The Union's Petition to Compel Arbitration, [1], is **DENIED** to the extent that the Court rejects the Union's request for an award of attorneys' fees and costs.  This matter is **DISMISSED without prejudice**.  Final judgment shall issue accordingly.

Date: 9/16/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**